If it pleases the Court, David Rosenfeld, on behalf of the Laborers' Union and the Petitioner, would like to reserve three minutes for rebuttal. In Lee-Lumber in 2001, the Unanimous Board tried to sort out what factors it would use in determining when an extension of time for bargaining would be warranted and how much time would be warranted where an employer had committed unfair labor practices and withdrawn recognition or committed unfair labor practices in bargaining. The Board set out five factors. This was in response to the D.C. Circuit, which had told the Board it needed to set out some consistent factors to use in cases where these issues arose. Lee-Lumber says that when an employer has withdrawn recognition and then resumes bargaining where the union is the incumbent union, that is, where the union is already there, the employer must resume bargaining for at least a minimum of six months and then, depending upon the five Lee-Lumber factors, an additional up to six months, but no more than a year. The reason for the year limit is that there's other Board doctrine that says that when a union is certified in an election, the maximum amount of time in which such a presumption applies is one year. So the Board kind of said, in the middle ground, it will impose at least six months and potentially another six months, depending upon the Lee-Lumber factors. The one factor that the Board never adopted in Lee-Lumber was whether the Board should look at what had happened before the bargaining resumed for the first six months as required by Lee-Lumber. That is, there isn't an additional six factor in which the Board says, we'll look at what happened in the past in bargaining or any other circumstances to make a determination whether there should be an additional six months. Can you explain why this was improper, counsel? It was improper because, in terms of this Court's power of review, the Board had the power to create a sixth standard, a sixth reason. It could have done that in Lee-Lumber. Well, suppose – I mean, what strikes me about this case is that we don't know anything at all about what happened in the earlier bargaining. But suppose we did know. Suppose we knew that there had been, over an 18-month period, many, many negotiation sessions. In fact, they had agreed on a wage level and on many other important terms. And that when they came back to the bargaining table, and suppose there was also not a two-year gap, which there was here, they started up there and it was much easier bargaining than it would have been. I mean, we knew that as opposed to hypothesizing about it. And then take into account the earlier period. Absolutely. In a slightly different sense, Your Honor. The parties show up and begin bargaining. An employer says, well, let's begin from here. We'll agree to these tentatives. And the union says, fine, let's agree to those tentatives. So we know as of the beginning of bargaining they've incorporated a lot of what they've done in the past, but what they did in the past was sort of irrelevant. What was relevant was that they began the bargaining taking into account that past. Right. So we don't. And as I understand this record, there is one sentence where the lawyer for the employer says something like they didn't start from scratch. You know, I think he says nothing specific about it at all. Well, actually, it's worse than that. He says in the transcript that we put on the table certain of our proposals. I'm not sure whether it was from scratch, but he says that the union representative, George, probably thought it was from scratch. So we don't know what happened during those many months, those roughly eight months of bargaining in 1999 and 2000 before the union stopped bargaining. We don't know if they accomplished anything, did anything, reached any agreements. And I think Your Honor is right that had the parties, when they resumed bargaining, put on the table their accomplishments from the past, whatever they were, the board could well have said as to factors one and two, that's relevant, factor one being whether it's initial bargaining. If they've accomplished a lot, that's important. Factor two is the complexity of bargaining. It's a lot less complex if you start bargaining off from where you've begun. Your Honor, just as apparent in the recent town and country case, even though there had been almost two years of bargaining before the employer would do recognition, they then showed up at the table, and we have no evidence what happened in that prior bargaining in that case, but we do know they began bargaining from a different place. They put on the table an international roofer's agreement or international agreement and began bargaining from that posture. So that it is certainly possible that in the appropriate case the board should take into account not what happened in the past, but how actually the parties adopted that for purposes of their bargaining. And actually, this would theoretically relate to the fifth factor. The fifth factor, which the board ignores, is the extent to which there's both progress and proximity toward an agreement. I'm putting aside the proximity issue here. Had the parties began negotiations and put on the table all that progress or lack of it, at least started from there, you could take that into account in evaluating the last factor. Here there's no evidence. And all we have is the what the board did in this case was the same mistake that the D.C. Circuit took it to task for in Lee-Lumbert. The majority says, well, there was bargaining in the past. There was eight months of it. And therefore assumes that something happened that became relevant to subsequent bargaining. There's no evidence, nothing in the record, not even the scintilla, other than Dan Feer's statement that they put some of their prior proposals on the table. We don't know if there's any agreement. So I think in those circumstances, the board could take into account not the passage of time, what the circumstances were when bargaining resumed after the employer came back to the table to bargain in good faith. And a somewhat different subject. I gather that the Chelsea Industries issue is not in the case at this point. At some point her brief seems to be sort of edging on it. But I gather my understanding is that the board believed it was not properly before because no exceptions were taken. That's correct. We raised the issue in the trial, raised it in our brief to the ALJ, had not raised it by way of exception because it didn't seem necessary at that time. Then when the board decided the case, we raised it by way of a motion for reconsideration, which the board summarily denied. But it does relate to another sort of factor in this case, which is the last factor, which is proximity to an agreement. And before I do that, I want to make one point about Lee Lumber because it's sort of an astounding point about the way the board approached this. The board's decision on page 6 of the record, this is at page 3 of the slip opinion, says, Lee Lumber is simply silent as to the right-hand column towards the bottom. Lee Lumber is simply silent as to pre-remedial bargaining, which is unsurprising considering that there was no such bargaining in that case. The lawyer refused to bargain before the parties ever went to the table. That's just dead wrong. If you look at page 399 of the board's decision in Lee Lumber, you'll see that that was an incumbent union that had a contract. The employer received a decertification petition. It would do recognition. The union immediately filed charges. And the employer came back and bargained for several months, met four or five times before it would do recognition the second time. So that issue was plainly in Lee Lumber. But the sort of theoretical point about Lee Lumber is that the board says in Lee Lumber, this is a case where there's an incumbent union. It has a contract. This extension issue is different when you're talking about an initial contract, because in Lee Lumber, there was a contract on which the parties could base their subsequent negotiations. You don't have the same complexities, Factor 2. You don't have the initial bargaining problems, Factor 1, in Lee Lumber. And this statement is just wrong and infects, I think, the board's analysis. Let me go back to the last issue, which is this proximity to an agreement, which I think plays into both the standard review here as well as what the board has. We know that on May 20th, May 19th, the only bargaining issue was whether to include this wage schedule. What was their finding about impasse? I mean, I gather this proximity thing sort of cuts in both directions. And it's confusing. Sometimes it may mean if there's an impasse, then that's reasonable time because you're not going to get any further. But if you're close, but there's no impasse, then so was there impasse? Or do we know? The board majority agrees that as Factor 5 impasse, there was no impasse. Nobody claimed impasse. What does it mean to say there are loggerheads, but there's no impasse? Well, you have to go back to the record to see how that word kind of crept into the – didn't creep into the record. Dan Fiers used it. But it's very important to understand that what he meant by loggerheads, or was he referring to, was not over the inclusion of the wage schedule. If you go back and look at the Employee Excerpt of Record 144, he specifically says what he meant by loggerheads was this newfound issue of whether the agreement had to be ratified. And he, at the last minute, says after they learn about the employee disaffection petition, oh, we want this ratified. And the ALJ specifically rejects that and says in the record that, quote, I find that the issue of ratification was a pending matter that was not a legitimate excuse for the Respondents to claim that the parties could not reach an agreement. He didn't claim impasse. He just said Fiers is saying we can't reach an agreement because the union won't ratify the judgment. Ratification, a mandatory subject, could preclude a contract. Not only not a mandatory subject, but the parties could have agreed to it, at which point the union has to live up to that. And the judge found that that was thrown on the table. Just as an interesting standard of review problem, the Ninth Circuit generally has taken the position that if the administrative law judge makes a finding, that's one of the factual findings that has to be taken into account by the board. The board doesn't reject that finding, that the ALJ said the employer relied upon this ratification issue. But in any case, the judge says, again, a finding that the board really doesn't reject that this issue of the wage schedule was, quote, a relatively minor matter in light of the history of negotiations. This is at page 14 of the record, page 11 of the judge's decision. Fiers took that position in his statement to the regional office that he notified the union that he agreed to, quote, take the current wage matter under consideration. I'm sorry, current wage, quote. So there couldn't have been an impasse because Dan Fiers tells the union, look, I know you want this in here. I'll take it under consideration, take it back to management. And so this proximity of agreement weighs very much in our favor because everything is agreed to with the exception of one, as the judge puts it, minor issue where the employer says to the union, look, I'll take it back and it's under consideration. And then Dan Fiers says, well, we got in loggerheads over this issue of ratification, which the judge finds was not an excuse because it hadn't been agreed to by the parties, and the board does not reject that finding and deals sort of it with a cursive sort of shortly in footnote 2 of the decision. So those factors weigh the factor of both the length of negotiations, the factor of proximity weigh in our favor. And the board in this decision says very clearly that the major reason why they won't extend it, and this is sort of an astounding thing, had they extended the bargain period by a week or two or three weeks, this issue, withdrawal recognition, would not have been permitted. But the board says we weigh most heavily the factor of the reasonable time of negotiations incorporating not the same. We don't weigh it most heavily. We consider it, but it's not relevant. Your Honor, excerpt of the record page 6. It's not preeminent. They simply say it's relevant. They also say that the top page 6. And the factor of time overwhelmingly is the respondent. They don't. They say that that factor does, but they say it's not the preeminent factor. It's everything.  They say they take into account everything. The final point before I stop is that the board in that same column says inconsistently it is true that the time period being measured begins with the employers bargaining in good faith, meaning November of 2002 when it resumed negotiations. And then at the bottom of that paragraph they say, thus to make analytically meaningful the language in Lee Lumber directing the board to consider the amount of time elapsed since the parties began to bargain, it's necessary to take into consideration the total amount. Then they say, notwithstanding the dissent's assertions to the contrary, we are not saying that the reasonable period includes pre-remedial bargaining. Well, they do take it into account. Ginsburg. Aside from a schematic reason, i.e., Lee Lumber didn't say it, what is do you have an explanation for why it oughtn't to be taken into account? It only ought to be taken into account when it's taken into account as one of the five Lee Lumber factors or where the board, through appropriate adjudication, issues a decision and says we'll take into a sixth factor pre-bargaining. But there's a good reason that the board will never can't do that, and that is because in most of the cases the bargaining, but not all, is infected by unfair labor practices. That is prior bargaining. Or there's been unfair labor practices that have infected it. And that's why there's no sixth Lee Lumber factor that says, let's look at what happened before. It's a remedial issue. Well, here there was a two-year gap in Congress. That's right. So the economic situation changed from there onward. We don't know what happened during that two-year time. All we know is that from the moment bargaining began, there were meetings and there was great progress towards a two-year agreement. So the board was in agreement during that first six months, and they were very close to an agreement when the employer would do recognition. All right. You're just about out of time. Thank you very much. Thank you. May it please the Court, my name is Richard Cohen. I'm appearing on behalf of the Labor Board. I think I have some perspectives that the Court might find of value to determine whether the board's dismissal of this complaint was rational. I have to say at the start, the one astounding thing about this case. What are you getting this rational standard from, by the way? From the Court. No, my understanding is our case law basically says it isn't rational. It's, well, it's universal camera, which is somewhat different. Well, the standard in the case law that we cited and in the footnote that we described, that one case that diverged from it, is rational. But I'm happy to deal with any standard one would like. I need to point out the moving target in this case. There are three issues that Mr. Rosenfeld has argued to this Court that were never argued to the board. This issue about ratification was not argued in his opening brief. It was not argued to the board. Mr. Rosenfeld did file exceptions to the administrative law judge's decision. He did not include that. He did not include the Chelsea issue. He did not include. He didn't, and that seems to be by the boards. But the ratification issue, you mean whether it's an impasse, is that what you mean? Yes. He mentioned nothing about ratification. But certainly the question, insofar as the ratification question and or the chart question feeds into how close they were to an agreement, that's before us. Yes. But the idea that ratification played any role in that is both belied by the record in the sense that Mr. Feers was clear that that did not contribute to the impasse and they didn't accept, they didn't argue this question to the board and to the court. They said there was only one issue at stake open for debate. There was no impasse. You agree that there was no impasse. Yes. Well, they said that there was only one issue open. Whether you agree. Yes. On the record before us, we assume that there's no impasse over anything. The board found that there was no impasse. However, the board found that they were at loggerheads. And they were at loggerheads concerning this issue of inclusion in this wage rate. And you need to understand the context of this. These parties reached agreement. What they understood was an agreement. And the union supplied the company with an agreement on May 8th. The company crossed out a bunch of things in that agreement and sent it back to Mr. Vaughan. A number of them were corrected by Mr. Vaughan or to the company's satisfaction. Two weren't. One was company language that they wanted penciled in, giving it the right for part-time employees. And another was this wage column issue. The wage column issue was raised in May 8th. It had been going on for well over a month before the union withdrew recognition. The reason why I say that this is quite an unusual case with a moving target is that the original unfair labor practice charge in this case was exactly predicated on the notion that the company and the union had an agreement and that the company's Without this language was an unfair labor practice. Are you going to address what appears to be the key question here, which is could they ‑‑ the board did take into account the prior negotiations. Were they entitled to do that? Absolutely. Okay. They certainly would have been on the hypothetical that I gave Mr. Rowe. But in this instance, we know nothing. I mean, I've looked really all over the record about the early negotiations or how they influenced the later negotiations, except this one sentence by Mr. Feers that says something like, well, you know, I could go ‑‑ I could show you how he did do it by scratch, but he didn't. As a matter of fact, Your Honor, we might not know anything about the specifics of negotiations, but we know an awful lot, an awful lot about the context of those earlier negotiations and their having been truncated and the ensuing litigation. An awful lot that bespeaks an approach to collective bargaining that is accepting by the employer. And that distinguishes this case from countercountry, which counsel relies on, and any number of withdrawal of recognition cases that you'll find. This is really quite unique. To begin with, the employer did not file objections to the election, immediately recognized the union in 1999 when it won the election, bargained for eight months, and then the union walked away for 17 months. Now, the general counsel bore the burden of proof in this case to demonstrate that six months was an inadequate time under a remedial bargaining order for an unfair labor practice that took place in that context. Now, when the employer litigated this initial withdrawal of recognition, when the union came back to it after 17 months and said, we want to bargain, and the employer said no, it did not challenge either the administrator's law judge's conclusion that it committed an unfair labor practice or that a remedial bargaining order was appropriate. It let that decision stand. As soon as the Board issued an affirmance, seemingly as soon as the union requested to bargain after that, it commenced bargaining. Just a minute. There was a hearing before ALJ. Yes. Absolutely. So that they did challenge up until that point. Absolutely. But they didn't challenge ALJ's opinion. Before the Board, as they could have, to delay. Right. So there was none of the unfair labor practices like you find in town and country that tainted a withdrawal of recognition, that tainted a petition by employees. I'm not understanding that. There was an unfair labor practice. Right. But there was not a showing at all that this company was averse to collective bargaining. And what the Board emphasized here was that the union, not the company, walked away from the bargaining table. It withdrew recognition without justification. That they did. Well, but the Board did not just look at that. It looked at it withdrew recognition after the union had walked away for 17 months, and it emphasized that the employer itself hadn't truncated bargaining. As to whether there was getting back to the factors that the Board relied on here in the bargaining history. You're talking about the Board, in this case, relied on the fact that the union had walked away for 17 months? That's true. And where is that? Well, we've sat through them briefly. Let me see. We don't know anything about why the union walked away for 17 months, right? No. And, you know, as I said, the burden is on the employer. The Board refers to it several times. I'm sorry, Your Honor. The Board relied on it several times, Your Honor. Let me ask you a question. Sure. Where is the substantial evidence for the following statement? The parties do not start from scratch when they resume bargaining November 2002. They had bargained from the time the union was certified until the union walked away, adding that time to the time so-and-so. Where is the substantial evidence for the notion that the earlier bargaining in any way impacted the bargain? Your Honor, the Board and Lee Ludmer explained why an initial contract is different than the other. You didn't answer my question. Where is the evidence? I'm explaining to you that. I think that it's a myopic reading of the term bargain from scratch to say that they had to add terms. This was a simple contract, and they reached agreement by the beginning of May. Your answer is there isn't any. No, no. That's not my answer. My answer is exactly what we pointed out in our brief, which is that these parties got to feel each other out, got to take each other's measure, got to explore many issues over eight months of bargaining. That's undisputed. And it wasn't infirmed by any unfair labor practices that the employer committed. Two years before, right, or more than two years before? How much time was it? It was more than two years before. Okay. And we know there is no evidence as to what happened the day they got together two and a half years later. That's correct. But, however, in the context of an unfair withdrawal of recognition that occurred when after eight months of bargaining, no unfair labor practice charges, the union disappears for 17 months, it's reasonable to assume that the union understands who they're dealing with, what the hot points are for this employer, what their parameters are of how they deal. They take the measure of the people they bargain with. And all those things are the kind of things and the ground rules for negotiation. Why are we speculating? I mean, that's what's so disturbing about this. I mean, there's the people who were there testified. They could have been asked to testify about this, but they didn't. Well, Mr. Feers had a limited recollection of what occurred years before. This case, until two weeks before trial, was alleged in the complaint as a refusal to sign a collective bargaining agreement that had been agreed to. Counsel, you did say? In three different... Judge Nelson has a question. Yes. It's about Mr. Feers. As I read the record, he testified the proposal made by the company picked up somewhat where we left off, and then he also stated, from the union's perspective, maybe the later negotiations started from scratch. I mean, that's all he said. There's no other evidence about anything that went on. Right. But these parties had dealt with one another in the same way that parties that negotiate a second contract had, and that's the whole predicate for the leap. That is a major factor in the Lee-Lumber scenario. The impression... Well, let me just ask a question about that since your time is running out. Is there any precedent to support the board's conclusion that the duration of the pre-remedial bargaining is relevant in determining whether the later bargaining continued for a reasonable period of time? We do have Lee's Lumber, but consideration of pre-remedial bargaining, we're seeing it to go against the purpose and policy underlying Lee's Lumber. What is your response? It's general law, which Lee Lumber certainly did not overrule but simply augmented. The board there said that there would be appropriate circumstances to look to pre-settlement, pre-complaint bargaining to shed light on post-settlement bargaining. In fact, in all withdrawal of recognition cases that are predicated on a showing of employee disaffection from the union and as an argument that there is a taint by earlier conduct that's unlawful by the employer, you look back and see what that earlier conduct was and the context in which it occurred. It's so disturbing here. We have no idea what that earlier conduct is. You're kind of using some circumstantial evidence as to the notion that this union was, that this employer was, you know, not a bad actor. But in terms of what actually happened in the bargaining section, there's no proof. Well, we do have a burden of proof, Your Honor, and we have a finding. We have one allegation, which is a withdrawal of recognition after the union had walked away. I'd just like to point out, I'd just like to point out. I'm not going to ask you a burden of proof question. I mean, the burden of proof is on the general counsel to prove the unfair labor practice. But with regard to the – if the Board relies on a fact that there doesn't seem to be any substantiation for, i.e., that the bargaining didn't start from scratch, does it matter where the burden lie in that? Well, I – we – you, Your Honor, you have a different perspective than I believe the Board does as to what bargaining from scratch implies. And, you know, you agree with Mr. Rosenfeld. I don't think that that is – I don't think that's – Bargaining from scratch is a statement about what happened at the bargaining table starting in November when they started to bargain. And it seems to be a statement that doesn't have any support in the record. And I – is your point that don't bargain from scratch means that they had bargained before and it doesn't tell you anything about how this bargaining began? I'd guess. Absolutely. That there was no indication. Simply a statement that they had bargained before, no matter what the impact on the later bargaining was. No matter – well, necessarily it would have an impact, I think, under Lee-Lumber. But I think the important – the one important thing that I would like – They spent 18 months – Your Honor, I – Yelling at each other and – I came a long way. There's one thing I want to say, that – and that is about this issue that Mr. Rosenfeld said they were close on. He filed an unfair labor practice charge, which went to complaint, which was taken out a week before the hearing in this, that said the employer committed an unfair labor practice by insisting that this wage language be taken out of the contract. So his client wasn't going to budge an inch and didn't. He just laughed at the company. Now, let me stop you there. Wait. Let me stop you there. And let me tell you, I came as far as you did. Okay. I've been waiting for this discussion because I want to move to a slightly different topic. I am going to take it up. And that is, what's baffled me about this is that this does appear to be an end-of-process issue that's left over. I didn't know about some of the history you referred to, but it seems to me that this issue that arose with regard to the column and labeling the current wage rates, that's something that you wind up when you document the agreement, which otherwise appears to have been reached. And it doesn't look like the party spent very long working that issue out. The Board declined to use the word impasse, specifically did not find an impasse and comes up with a substitute loggerhead, but I can't figure out what that's supposed to mean in this context. What makes us think the parties weren't going to work this out if they'd taken more than 10 minutes to talk about it? Well, they're – they took well more than 10 minutes. They were talking about it since May. The testimony is they talked about it several times in June, and Mr. Vaughn made his position clear. They had filed an unfair labor practice charge. And the ironic thing, the truly ironic thing about this case, from my perspective – and again, it's your job to decide this case, not mine, and I appreciate that – is that if what Mr. Rosenfeld has said, and he said it in his brief, that this thing didn't matter, then why didn't the union just take it out? Then why didn't the union just take it out? The company had reasons for why it wanted it out, and it served no useful purpose whatever. The contract provision concerning wages just reads in the contract itself establishing minimums. There's a footnote in the negotiated addendum that preserves the wage rates for individual employees. This column does not match up to individual employees. It makes no sense except as what Mr. Vaughn said to Mr. Feers, which was, look, you've negotiated these minimums and the ability to hire people at higher wage rates if you want. You don't like this language because that will make that prerogative more difficult. Hire everyone at what these current employees are making, no matter – and that was his position. And he was not prepared to bargain about it. They thought they had a winner. They had a contract that had a one-and-a-half percent wage increase for the regular employees, not in the first year of the agreement, in the second and the third year. The employees didn't like it. They signed the petition and said, whoa, please don't talk to these guys anymore. They're not talking to us. They're not giving us a voice in this thing. And we don't like the agreement. They filed charges, and there are three specific allegations in every section of the complaint up to – Excuse me. You keep going back to these charges that are not before us. And I have a hard time – I mean, I know you're very anxious to tell us about them, but they're not before us. And they were withdrawn, and they're just not here. Except that – It's a hard time understanding why we should be worrying about them. Except that you're asking what Lockerheads means. And that was a term that was not used in the context of ratification, but was used in the context of this issue. And I might add that the question of ratification, the record on ratification, is very different than what Mr. Rosenfeld says. The company – All right. I think you're done. So, okay. Thank you very much. Thank you for your argument. I appreciate it. Mr. Rosenfeld, we'll give you two minutes. The judge found that the issue of the wage scale was a relatively minor matter. What did the board say about that? The board said on page – the excerpt of record 4 on the first page of the board's decision, specifically the union wanted – this is on the right-hand side – to include as an addendum to the contract a table setting forth the current wage rates of the union employees, and the Respondent objected to the inclusion of such a table. Pierce testified that the parties were at Lockerheads over this issue. That's the factual thing. How does it figure into the analysis? It figured only as to Factor V, the proximity of what the parties were close to in agreement. And the board says that as to the proximity issue, that doesn't favor the general counsel's position because of that issue. That's discussed at – Well, in Factor V, they say it did favor the general counsel's position. So I understood it. No, I'm sorry. That's impasse. Proximity to agreement is Factor IV. Okay. I'm sorry. So they say as to Factors II, III, and IV, that doesn't favor the general counsel's position because even though the parties agreed on everything except that one issue, the minor issue of the wage scale. And the point I was making about ratification is the judge is finding, Your Honor, which is specifically contrary to what Mr. Cohen told you. It's on page 12. On the left-hand side where the judge deals with this, he quotes from the position written by Dan Feers in which Feers says, Faced with the petition signed by an overwhelming number of employees, it was apparent that, one, the employees had not ratified the proposal, and, two, the union didn't represent the majority. So the judge finds the reason that the employer took the position there was no agreement was because of this ratification issue. The judge says it wasn't this relatively minor issue of including the wage schedule. Okay. The final point is the argument and international union LRB submitted, and we will adjourn for the day. Thank you. Thank you.
judges: Dw Nelson, Berzon, Clifton, Cjj